# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

GUARANTY BANK,

        Plaintiff,

v.                                                                            Case No. 09-CV-133

EVANSTON INSURANCE COMPANY and
UNIVERSAL ASSURORS AGENCY, INC.

        Defendants.

_____

# ORDER

On February 10, 2009, Guaranty Bank ("Guaranty") filed a complaint against Evanston Insurance Company ("Evanston") and Universal Assurors Agency, Inc. ("Universal") alleging that Evanston and Universal sold and issued Guaranty an insurance policy in violation of Wisconsin law. Guaranty seeks a declaratory judgment addressing the parties' rights and obligations under the policy, the reimbursement of premiums it paid under the policy, and indemnification by defendants against tax liabilities Guaranty may face from Wisconsin's Commissioner of Insurance ("Commissioner"). The court has jurisdiction over these claims pursuant to 28 U.S.C. § 1332, since the parties have diverse citizenship and the amount in controversy exceeds $75,000.00. On March 16, 2009, defendants filed answers to the complaint.

On March 24, 2009, Guaranty filed a motion for a preliminary injunction relieving Guaranty of its obligation to pay defendants premiums under the policy

during the course of this litigation, enjoining Evanston from terminating coverage under the policy, and ordering Evanston to promptly pay all valid claims made by Guaranty under the policy within 30 days. Both defendants have responded in opposition to Guaranty's motion. Before addressing the motion, the court briefly reviews the background of this case.

## BACKGROUND

Guaranty is a federal savings bank with its principal place of business in Brown Deer, Wisconsin. (Compl. ¶ 1, Docket #1). It maintains 175 retail bank branches in five states, most of which are located in supermarkets. (Pl.'s Br. in Supp. 13, Docket #24). Guaranty also operates a national residential mortgage lending business through its subsidiaries. (Pl.'s Br. in Supp. 13, Docket #24). Evanston is an insurance provider incorporated in Illinois with its principal place of business in Deerfield, Illinois. (Compl. ¶ 2). Universal is an insurance agent incorporated in Nebraska with its principal place of business in Omaha, Nebraska. (Compl. ¶ 3).

On May 1, 2004, Evanston issued an insurance policy to Guaranty, in which Evanston agreed to indemnify Guaranty against credit losses on certain home equity loans in exchange for premium payments.[1] (Compl. ¶ 6, Ex. A). The policy contains no fixed term and continues until either Guaranty or Evanston cancels it pursuant to section 14 of the policy. (Compl. Ex. A). The policy's pricing model calls for a sliding

---

[1] Universal acted as the underwriting manager under the policy. (Compl. Ex. A).

-2-

scale of monthly premiums based on the value of Guaranty's home equity portfolio covered by the policy. (Compl. Ex. A). Under the protection of the policy, Guaranty increased its portfolio of home equity loans substantially, from $34.9 million in 2004 to $634 million in 2009. (Micek Decl. ¶ 6, Docket #36; Pl's Reply Br. 13, Docket #42). During this time, the parties renegotiated the policy's pricing model twice, first in 2006 and again in 2007. (Compl. Ex. A). Since the policy's inception, Evanston alleges that it has paid out claims in excess of $24 million, and has covered potential losses for approximately 36,000 home equity loans. (Micek Decl. ¶ 7, Docket #36; Evanston's Br. in Opp'n 8, Docket #33). For its part, Guaranty has paid over $30 million in premiums to defendants. (Pl.'s Br. in Supp. 8, Docket #24).

This year, losses from Guaranty's home equity loan portfolio have mounted. As of April, Evanston claimed that it was paying loss claims under the policy at a rate of approximately $2.5 million per month, and that it has withheld payment on some claims because the monthly losses have exceeded the agreed upon premium-to-loss ratio in the policy. (Blazer Decl. ¶ 3, Docket #37). At the same time, Guaranty's monthly premiums have increased from a rate of $1.15 per $1,000 of covered loans to $4.77 per $1,000 as of November of 2008.[2] According to Guaranty's chief financial officer, the increased premiums could cost Guaranty in excess of $53 million over the course of this year alone. (Menheer Aff. ¶ 3, Docket #28).

---

[2] Guaranty states in its brief in support that it expected this rate to increase in April of 2009. (Pl.'s Br. in Supp. 7, Docket #24).

-3-

But Guaranty's problems are not limited to its home equity loan portfolio. On March 11, 2009, the Office of Thrift Supervision ("OTS"), a bank regulatory agency, issued a cease and desist order against Guaranty requiring the bank to increase its tier 1 capital ratio from about 5% to at least 8%, and to increase its total risk-based capital ratio from 10% to at least 12%.[3] Guaranty claims that it cannot meet the OTS's demands and continue to pay defendants premiums as they come due. (Menheer Aff. ¶ 6, Docket #28). Nor is Guaranty inclined to cancel coverage under the policy to avoid paying premiums, because this too would cause a deterioration of its capital ratios. Guaranty claims that the only way it can comply with the OTS's order is to stop paying defendants the monthly premiums while maintaining its credit loss protection under the policy.

## ANALYSIS

Before the court will issue preliminary injunctive relief, the party seeking such relief must first demonstrate the following: (1) a reasonable likelihood of success on the merits of the party's claims; (2) that the party had no adequate remedy at law; and (3) that the party will suffer irreparable harm in the absence of injunctive relief. *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474-75 (7th Cir. 2001). If the moving party fails to demonstrate any of these threshold elements, the court must

---

[3] According to Guaranty's president and chief executive officer, as of January 31, 2009, Guaranty had a tier 1 capital ratio of 5.02% and a total risk-based capital ratio of 10%. (Douglas Levy Aff. ¶ 3, Docket 26). For a definition of tier 1 capital, as well as the tier 1 capital and total risk-based capital ratios, *see* Office of Thrift Supervision, Examination Handbook §120 App. A (November 2003), available at http://files.ots.treas.gov//422019.pdf (last visited July 7, 2009).

-4-

deny preliminary injunctive relief.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).  If, however, the moving party meets the first three threshold elements, the court must then weigh the irreparable harm the moving party would suffer in the absence of an injunction against the irreparable harm the nonmoving party would suffer if the injunction were issued.  *Id.*

To meet the first threshold element for preliminary injunctive relief, the moving party must show "a 'better than negligible' chance of success on the merits of at least one of its claims."  *Id.* at 1096 (citations omitted).  Guaranty's first claim seeks an order declaring that Guaranty has no obligation to continue paying premiums under the policy, but that Evanston must continue coverage indefinitely under the policy and pay out all valid loss claims.  Guaranty's second and third claims seek reimbursement of the premiums Guaranty has previously paid to defendants as well as indemnification from any penalties Guaranty may face from alleged nonpayment of state taxes.  While the first threshold element could be met by showing a chance of success on any of these three claims, Guaranty does not include in its briefings any discussion of its likelihood of success on the merits of its second and third claims.  Therefore, the court focuses only on Guaranty's first claim for declaratory relief.  *See generally*, *LINC Finance Corp. v. Onwuteaka*, 129 F.3d 917, 921-22 (7th Cir. 1997) (holding that the "court has no duty to research and construct arguments available to a party").

Guaranty argues that it is likely to prevail on its declaratory judgment claim because the remedy for defendants' unauthorized sale and issuance of the policy is unilateral enforcement of the policy against defendants. Guaranty claims that Evanston did not obtain a certificate of authority to do business in Wisconsin under Wis. Stat. § 618.12 before issuing the policy. Without this certificate, Guaranty claims that neither Universal nor Evanston could sell or issue the policy in Wisconsin. Defendants do not dispute that Evanston had not obtained a certificate of authority in Wisconsin when it issued the policy. However, defendants argue that the sale and issuance of the policy was authorized under Wisconsin law because it was surplus lines insurance. Defendants further argue that even if they lacked authority to sell and issue the policy in Wisconsin, Guaranty would not be entitled to continued coverage under the policy without paying premiums.

In general, Wisconsin requires that insurers seeking to do business in Wisconsin apply for, and obtain a certificate of authority from the Commissioner before issuing insurance policies within the state. *See* Wis. Stat. §§ 618.11-618.12. However, Wisconsin allows foreign insurers and their authorized agents to sell and issue what is referred to as surplus lines insurance without a certificate of authority. Wis. Stat. § 618.41. Surplus lines insurance includes credit insurance, but does not include mortgage guarantee insurance. Wis. Admin. Code [Ins.] §§ 6.17 and 6.75. Credit insurance is defined as "insurance against loss arising from failure of debtors to meet financial obligations to creditors," except for, among other things, those

-6-

obligations secured by a first lien on residential real estate. Wis. Admin. Code [Ins.] § 6.75(2)(j). Mortgage guarantee insurance is defined as follows:

> [I]nsurance against loss arising from failure of:
>
> 1. Debtors to meet financial obligations to creditors under evidences of indebtedness which are secured by either:
>    a. A first lien or charge on residential real estate designed for occupancy by not more than four families; or
>    b. I. A first lien or charge on residential real estate designed for occupancy by 5 or more families; or
>       ii. A first lien or charge on real estate designed for industrial or commercial purposes; or
>    c. A stock or membership certificate issued to the tenant stockholders or resident members of a completed fee simple cooperative housing corporation . . . .; or
>    d. A junior lien or charge on residential real estate.
> 2. Lessees to make payment of rentals under leases of real estate in which the lease extends for 3 years or longer

Wis. Admin. Code [Ins.] § 6.75(I).

Guaranty argues that the policy in this case is mortgage guarantee insurance and, therefore, defendants were not authorized to sell and issue it as surplus lines insurance. Defendants argue that the policy falls within the category of credit insurance and, therefore, qualifies as surplus lines insurance. The policy itself is entitled "CREDIT INSURANCE POLICY," and one of the endorsements attached to the policy specifically states that "[t]his Policy has been issued on a Surplus Lines basis." (Compl. Ex. A). The policy also provides for the collection of a surplus lines tax of 3% from Guaranty. (Compl. Ex. A). These notices contained in the policy, and the surplus lines tax charged to the policy holder are consistent with Wisconsin

law governing surplus lines credit insurance. *See* Wis. Stat. § 618.41(9). Yet, the policy purports to cover risks of loss from home equity loans secured by a second mortgage or a deed of trust on real property. (Compl. Ex. A). This makes the risks covered under the policy consistent with the risks included in the Commissioner's definition of mortgage guarantee insurance. Therefore, the policy could qualify as both credit insurance and mortgage guarantee insurance under the Commissioner's regulations of surplus lines insurance. If it is mortgage guarantee insurance, the policy may indeed be unauthorized under Wisconsin law. But the court need not make this determination today. Suffice is to say that Guaranty has a better than negligible chance of successfully proving the policy is mortgage guarantee insurance issued in violation of Wisconsin law. This, however, does not end the court's inquiry on the question of likelihood of success on the merits.

Guaranty's success on the merits of its declaratory judgment claim also depends on the court ultimately accepting its legal theory that Wisconsin law entitles Guaranty to the specific relief it seeks; namely, that Guaranty should receive continued coverage under the policy, free of charge, for the life of all of the qualifying home equity loans in Guaranty's loan portfolio. Defendants argue that Guaranty would not be entitled to free insurance benefits going forward even if the policy had been sold and issued without authorization under Wisconsin law.

In Wisconsin, an insurance policy entered into in violation of state insurance laws "is unenforceable by, but enforceable against, the insurer." Wis. Stat. 618.44.

-8-

This statute somewhat modifies the common law rule that courts viewing an illegal contract should leave the parties to that contract as they are found. *See Ehrlich v. City of Racine*, 26 Wis.2d 352, 360 (1965). While § 618.44 allows enforcement of the insurance policy against the insurer, it does not allow for unilateral modification of the policy's terms by the insured. But this is precisely what Guaranty seeks in this case.

In its motion for preliminary injunctive relief and its declaratory judgment claim, Guaranty seeks enforcement of terms not contained in the policy. As it stands, the policy creates a bilateral agreement under which Evanston agrees to provide credit loss insurance coverage on qualifying home equity loans as long as Guaranty continues to pay the applicable monthly premiums. As noted above, the policy provides either party the power to cancel coverage. (Compl. Ex. A). Granting Guaranty the prospective relief it seeks would fundamentally alter the terms of the policy, and vitiate the bilateral nature of the agreement. Defendants would be stuck with untold losses on covered loans without receiving any future premiums, while Guaranty would enjoy all the upside benefits flowing from those loans at no cost. Guaranty refers to this result as a "sanction" for defendants' alleged illegal sale and issuance of the policy. Yet, § 618.44 provides for unilateral enforcement against the insurer, not sanctions. Moreover, Guaranty has failed to direct the court to any relevant legal precedent supporting its proposition that an insured may unilaterally modify an illegally placed insurance policy in such a manner. Under the court's

-9-

reading of Wisconsin law, Guaranty may enforce the policy agreed to by the parties under § 618.44, or it may choose to walk away under the terms of the policy. Guaranty cannot have its cake and eat it too. Because Guaranty's declaratory judgment claim does not seek a permissible remedy, Guaranty has failed to demonstrate a reasonable likelihood of success on the merits of that claim.

Even if Guaranty had shown a reasonable likelihood of success on the merits of its declaratory judgment claim, the court would nonetheless be obliged to deny injunctive relief because an adequate remedy at law exists in this case. A remedy at law, such as money damages, is inadequate if it is "seriously deficient as compared to the harm suffered." *FoodComm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). The Seventh Circuit has recognized four common scenarios for which a remedy at law is inadequate: (1) the nature of the plaintiff's alleged loss makes calculation of damages difficult; (2) the plaintiff's lost revenue would make it impossible to finance litigation; (3) the defendant's insolvency would leave the plaintiff with no ability to collect damages; or (4) a damages award would come too late to save the plaintiff's business, *see Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1095.

Here, Guaranty claims that this case falls into the fourth scenario, because Guaranty may not survive until final judgment in this case. Defendants respond arguing that reimbursement of previously paid premiums is an adequate remedy and, therefore, injunctive relief is not warranted. The court agrees. While Guaranty's

-10-

potential recovery of previously paid premiums may not ultimately save Guaranty as an independent financial institution, it is sufficient to provide Guaranty an adequate remedy for the claims alleged in its complaint. Guaranty makes no claim that defendants' alleged illegal sale and issuance of the policy caused its current financial difficulties. Instead, Guaranty merely asserts that damages in this case would be too little, too late to save Guaranty from further regulatory actions by the OTS and perhaps other regulators. However, the potential regulatory actions are of little relevance to the subject matter this litigation.

For similar reasons, Guaranty has also failed to show it will suffer any irreparable harm in the absence of a preliminary injunction. A harm is irreparable, for purposes of preliminary injunctive relief, if it "cannot be prevented or fully rectified by the final judgment after trial." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Implicit in the idea of irreparable harm is that the harm is actually caused or maintained by the actions of a defendant. *See FoodComm Int'l*, 328 F.3d at 305. Guaranty claims that it will suffer irreparable harm if it is required to pay the premiums due under the policy, because doing so would prevent it from complying with the regulatory demands of the OTS. Guaranty asserts that its noncompliance with bank regulatory requirements is a result of the increasing premiums due under the policy. Defendants respond arguing that Guaranty's failure to meet regulatory requirements does not rise to the level of irreparable harm, and that Guaranty has not shown that this harm is being caused by defendants' alleged

-11-

misconduct. The parties argue at some length on the issue of whether the panoply of regulatory actions Guaranty may face, including a forced merger, should be considered irreparable harm as a matter of law. However, the court need not decide this issue because Guaranty has not demonstrated that its proffered irreparable harm was or is caused by the alleged actions of defendants. Guaranty has not alleged that the policy is wholly invalid. To the contrary, Guaranty wants and needs continued loss coverage defendants are providing under the policy. While the policy at issue in this case may have facilitated Guaranty's ability to originate loan risks it cannot now afford to bear, this link between the defendants' actions and Guaranty's alleged regulatory harms is too tenuous to justify injunctive relief.

Finally, when balancing of harms of granting injunctive relief against the harms of denying such relief, the scales tip in favor of denial of Guaranty's motion. Guaranty's financial woes run much deeper than the policy of insurance at issue in this case. Granting Guaranty the preliminary relief it seeks may not be enough to avoid the regulatory actions Guaranty now faces. Guaranty readily admits that a preliminary injunction would only allow it "breathing room" to restructure its business operations and raise additional capital. Therefore, injunctive relief may have little effect on the harms Guaranty claims. On the other hand, if the preliminary injunction Guaranty seeks were granted, defendants would be left with the downside risk of Guaranty's entire home equity portfolio without any potential for gain. This is a result neither party bargained for, and one that the court is loath to impose.

Accordingly,

**IT IS ORDERED** that plaintiff's motion for a preliminary injunction (Docket #23) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 14th day of July, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge